# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | Civ. No. _____ |
| | ) | |
| 374 High Street, Farmington, Maine; | ) | |
| 249 Seamon Road, Farmington, Maine; | ) | |
| 269 Seamon Road, Farmington, Maine; | ) | |
| 247 Front Street, Farmington, Maine; | ) | |
| 407 Wilton Road, Farmington, Maine; | ) | |
| 497 Federal Row, Industry, Maine; | ) | |
| Map/Lot R2-28-005B, North Shore Drive, | ) | |
| Industry, Maine; | ) | |
| 105 Avon Valley Road, Avon, Maine; | ) | |
| 5003 Twin Brook Road, Carrabassett | ) | |
| Valley, Maine; | ) | |
| 42 Village Woods Drive, Rangeley, Maine; | ) | |
| 3155 Main Street, Rangeley, Maine; and | ) | |
| 115 Knowlton Corner Road, Farmington, Maine | ) | |
| with all appurtenances and improvements | ) | |
| thereon, | ) | |
| | ) | |
| **Defendants *in rem*.** | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by and through its attorneys, Halsey B. Frank, United States Attorney for the District of Maine, and Donald E. Clark and Noah Falk, Assistant United States Attorneys, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.     This is a civil action *in rem* brought to enforce the provisions of: (1) 21 U.S.C. §§ 881(a)(6) and 881(a)(7) and 28 U.S.C. § 2461, which provide for the forfeiture of all proceeds of, and/or real property that facilitated, drug trafficking, in violation of the Controlled Substances

Act, 21 U.S.C. § 801, et seq.; and (2) 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any real or personal property involved in a money laundering transaction, in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property.

## JURISDICTION AND VENUE

2.      This Court has *in rem* jurisdiction over the defendants *in rem* under 28 U.S.C. § 1355(b). Venue is proper in this district: (a) pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred in this district; and (b) pursuant to 28 U.S.C. § 1395(b) because the defendants *in rem* are located in this district.

## THE DEFENDANTS *IN REM*

3.      The defendants *in rem* are real properties located at the following Maine addresses, and more particularly described in municipal tax records as having the map/lot number reflected below or on deeds recorded at the book/page reflected below at the Franklin County Registry of Deeds:

| Address | Owner of Record | Map/Lot | Deed Book/Page |
|---|---|---|---|
| 374 High Street Farmington, ME | Sandy River Properties, LLC | U09-002-A | 2201/74 |
| 249 Seamon Road, Farmington, ME | Robert J. Sirois | R04-026-A | 1454/125 |
| 269 Seamon Road, Farmington, ME | Lucas J. Sirois | R04-032 | 3248/239 |
| 247 Front St., Farmington, ME | Front St. Investments | U14-047 | 1725/302 |
| 407 Wilton Road, Farmington, ME | Robert J. Sirois | U34-004 | 1454/125 |
| 497 Federal Row, Industry, ME | Lucas J. Sirois | R02-028-001 | 2073/106 |
| Map/Lot R2-28-005B, North Shore Drive, Industry, ME | Lucas & Alisa Sirois | R2-28-0005B | 3676/94 |
| 105 Avon Valley Road, Avon, ME | Spruce Valley, LLC | 5U-9A | 3923/330 |
| 5003 Twin Brook Road, Carrabassett Valley, ME | Lucas Sirois | 0011-0092 | 4153/108 |
| 42 Village Woods Dr., Rangeley, ME | Lucas & Alisa Sirois | 008-065-003 | 3222/69 |
| 3155 Main St., Rangeley, ME | Lucas & Alisa Sirois | 007-048 | 3848/204 |
| 115 Knowlton Corner Road, | Robert Sirois | U37-011 | 3727/260 |

| Address | Owner of Record | Map/Lot | Deed Book/Page |
|---|---|---|---|
| Farmington,  ME | | | |

4.     According to records on file with the Maine Secretary of State's Office, and/or records provided to financial institutions by customers when financial accounts were opened, the following are the members of the LLC or partnership identified below:

| Entity | Members/Partners |
|---|---|
| Sandy River Properties, LLC | Lucas Sirois and Randal Cousineau |
| Spruce Valley, LLC | Lucas Sirois and William Brey |
| Front Street Investments (a partnership) | Robert Sirois, Charles Williams, Peter Beane |

## STATEMENT OF PROBABLE CAUSE

### Background

5.     Since about August 2018, the U.S. Drug Enforcement Administration ("DEA") and the Internal Revenue Service-Criminal Investigation and their partner law enforcement agencies have been investigating a drug conspiracy centered around the illegal industrial cultivation and distribution of marijuana in and around the Farmington, Maine area, and the subsequent laundering of the proceeds realized from its illegal cultivation and distribution.

6.     LUCAS SIROIS is a leader of the organization.

7.     ROBERT J. SIROIS is LUCAS SIROIS's father, administers active marijuana grows in cooperation with LUCAS SIROIS, and draws a weekly cash salary from operations at LUCAS SIROIS's primary industrial marijuana grow, the "Shoe Shop," located at 374 High Street, in Farmington. On July 23, 2010, ROBERT J. SIROIS was convicted in Maine Superior Court, in Farmington, of felony unlawful trafficking in scheduled drugs and felony cultivating marijuana.

8.     ALISA SIROIS a/k/a "Lisa Sirois," a/k/a "Alisa Merwin," is LUCAS SIROIS's estranged wife who has a managerial role in LUCAS SIROIS's operations, including an active

3

role supervising operations at the Shoe Shop, among other duties.

9.     RANDAL COUSINEAU is the primary financier of SIROIS's marijuana business. COUSINEAU and SIROIS share an interest in Sandy River Properties, LLC, the vehicle through which COUSINEAU realizes his interest in SIROIS's illicit marijuana production and distribution activities.

10.    WILLIAM BREY is co-owner with LUCAS SIROIS of Spruce Valley, LLC, which owns 105 Avon Valley Road, Avon, Maine (the "Old Toy Factory"), an industrial marijuana grow location for SIROIS's illicit marijuana production and distribution activities.

11.    CHARLES WILLIAMS is part owner of Front Street Investments, which owns the real property at 247 Front Street, Farmington, Maine, an industrial marijuana grow location for SIROIS's illicit marijuana production and distribution activities.

12.    PETER BEANE is part owner of Front Street Investments, which owns the real property at 247 Front Street.

13.    Under Maine's medical marijuana law, a caregiver license only permits cultivation of a set number of marijuana plants, usually 30 mature plants, 60 immature plants and unlimited seedlings per caregiver. See Title 22, Maine Health and Welfare Law, Chapter 558-C, Section 2423-A(2)(B). Maine law does not allow caregivers to operate as "collectives." In other words, if an individual caregiver hires multiple other caregivers as employees, and pays them a salary to grow marijuana plants that the individual actually owns and on the individual's behalf, that would be in violation of Maine law. See Title 22, Maine Health and Welfare Law, Chapter 558-C, Section 2430-D ("Collectives prohibited"). Maine law also limits sales of medical marijuana to qualifying patients from outside of Maine who can possess no more than 2.5 ounces in 15 days and prohibits wholesale transactions to out-of-state customers. See Title 22, Maine

Health and Welfare Law, Chapter 558-C, Section 2423-D (Authorized conduct by a visiting qualifying patient) and Section 2423-A(2)(K-1)(defining permissible conduct of a caregiver, including that registered caregivers may only conduct certain wholesale transactions with other registered caregivers, who must be, by definition, Maine residents).

14.     The investigation has revealed that SIROIS and his coconspirators have, among other things: (a) grown marijuana at more locations than authorized and registered to SIROIS; (b) grown more plants at those locations than permitted by SIROIS's licensing; (c) employed individuals to cultivate marijuana who did not hold caregiver licenses or could not hold a caregiver license due to felony convictions; (d) distributed marijuana to people who were not participants in Maine's medical marijuana program, including customers from outside of Maine; (e) engaged in the laundering of proceeds illegally derived from the illicit production and distribution of marijuana; and (f) held properties in the names of LLCs and a partnership to conceal the true owner of the properties.

15.     A cell of the drug conspiracy is controlled by a coconspirator ("CC-1"). CC-1 has exported bulk marijuana for sale in New York, New Jersey, Massachusetts, and other states. CC-1 was employed by SIROIS at the Shoe Shop and performed tissue culturing and other tasks in connection with the cultivation of SIROIS's illegal marijuana production and distribution business. CC-1 has also conducted numerous marijuana transactions with SIROIS, either purchasing from or selling to SIROIS bulk marijuana and/or marijuana derived products.

16.     According to a DEA confidential witness ("WITNESS-1"), WITNESS-1 worked for LUCAS SIROIS at the Shoe Shop from about January 2019 through about the end of November 2019, when WITNESS-1's employment was terminated by SIROIS.

17.     WITNESS-1 was terminated because WITNESS-1 continually advised SIROIS

5

that his marijuana cultivation activities at the Shoe Shop were out of compliance with Maine's medical marijuana program; ultimately, rather than correct those compliance issues, which were extensive and significant, SIROIS terminated WITNESS-1.

18.     In about March 2019, WITNESS-1 was promoted by SIROIS to clean the grow rooms at the Shoe Shop. In the fall of 2019, WITNESS-1 was promoted into a role WITNESS-1 described as an operations supervisor. During WITNESS-1's employment, WITNESS-1 was paid exclusively in cash. WITNESS-1 received payment directly from SIROIS, and also from another coconspirator ("CC-2"), who WITNESS-1 understood was a partner in the business with SIROIS. CC-2 reported to the Shoe Shop about three times per week. Beginning in about March 2019, CC-2 delegated the responsibility of paying Shoe Shop employees to WITNESS-1. CC-2 would arrive at the Shoe Shop every Thursday with a bag of cash, and hand the cash to WITNESS-1, who would, in turn, pay the other Shoe Shop employees.

19.     The Shoe Shop facility housed eight grow rooms, each containing numerous marijuana plants in various stages of cultivation.  During the period of about 11 months that WITNESS-1 was employed at the Shoe Shop, it produced about 600 pounds of marijuana for distribution.  SIROIS hired individuals to cultivate that marijuana for him and SIROIS paid those individuals a weekly cash salary.

20.     On at least one occasion, LUCAS SIROIS directed WITNESS-1 not to let Maine compliance investigators into the Shoe Shop facility.  SIROIS installed external cameras and a security system in order to detect approaching law enforcement in advance of their arrival, so that unlicensed individuals, including prior felons, who worked for SIROIS, including SIROIS's father, ROBERT SIROIS, could flee the Shoe Shop in advance of law enforcement's arrival. ROBERT SIROIS was paid a $1200 per week cash salary as a custodian at the Shoe Shop.

21.     In about late 2019, two coconspirators ("CC-3" and "CC-4"), who were former Franklin County Sheriff's Deputies, formed a marijuana company with SIROIS called Narrow Gauge Distributors, a/k/a "NGD." However, prior to the formation of Narrow Gauge Distributors, CC-3 and CC-4 were routinely present at the Shoe Shop at the invitation of LUCAS SIROIS, including while CC-3 and CC-4 were still employed as members of law enforcement. From about September 2019 through about November 2019, CC-3 and CC-4 were given a large office inside the Shoe Shop. CC-3 and CC-4 frequented the Shoe Shop while wearing their Sheriff's Deputy uniforms, and carrying their service weapons.

22.     Prior to forming Narrow Gauge Distributors, and while still employed as Sheriff's Deputies, CC-3 and CC-4 were provided with key access to the Shoe Shop. CC-3 and CC-4 performed tasks at the direction of SIROIS during this time period. For example, in about September 2019, CC-4 picked up about 12 pounds of marijuana at a Bridgton, Maine dispensary and delivered that marijuana to the Shoe Shop. Further, CC-3 obtained a booking photograph of WITNESS-1, which WITNESS-1 saw on CC-3's cellular phone. CC-3 told WITNESS-1 that when you are in law enforcement, you can find out a lot of things about people. CC-3 further informed WITNESS-1 that CC-3 would drive through the parking lot of the Shoe Shop and run the license plates of the vehicles parked at the facility in order to assist SIROIS in better understanding who he was employing, and who were his customers. Also during this time period, on occasions when CC-3 and CC-4 were present in the Shoe Shop, and other law enforcement vehicles entered the parking lot, both CC-3 and CC-4 would "hit the ground" to avoid being seen by their law enforcement peers.

23.     Based in part on WITNESS-1's examination of the books and records maintained at the Shoe Shop, WITNESS-1 estimated that SIROIS sold -- and accounted for the sale of --

about 75% of the marijuana he cultivated to licensed dispensaries and store fronts in Maine; the remaining 25% was sold on the black market and did not appear in the Shoe Shop's ledgers. In order to effectuate black market distribution, SIROIS employed a courier who regularly facilitated the transportation of marijuana out of state. Additionally, individuals from outside of Maine traveled to the Shoe Shop to purchase marijuana for out of state distribution.

24.     For example, WITNESS-1 is aware of one such black market transaction involving four individuals who arrived at the Shoe Shop in a truck bearing Pennsylvania license plates. The individuals entered the Shoe Shop, and each carried a visible firearm. The individuals loaded about 40 to 50 pounds of bulk marijuana into duffle bags and transferred those to their truck. Before the individuals left the Shoe Shop, they observed a Farmington Police Department marked police cruiser outside of the facility. CC-3 created a courier card for the occupants of the truck, which CC-3 indicated would "legitimize" the transportation of marijuana, in the event that law enforcement pulled over the truck after its departure.

25.     At various times throughout WITNESS-1's employment, SIROIS and CC-2 each informed WITNESS-1 that CC-3 and CC-4 had an agreement with SIROIS, whereby SIROIS paid CC-3 and CC-4 $100 each per pound of marijuana that they sold on SIROIS's behalf, while SIROIS and his partners, including RANDAL COUSINEAU, kept at least $1,400 per pound of marijuana sold.

26.     CC-2 informed WITNESS-1 that SIROIS paid CC-2 $5,000 per week to "fix" SIROIS's problems. WITNESS-1 was further informed by CC-2 that CC-2 had a box of bulk cash -- proceeds of the marijuana business -- that was originally stored inside SIROIS's residence, and was later moved to CC-2's residence.

27.     According to WITNESS-1, CC-1 worked for SIROIS performing tissue cultures

at the Shoe Shop.

28.     According to WITNESS-1, ALISA SIROIS worked at the Shoe Shop as a caretaker in the past. During that time, ALISA SIROIS and LUCAS SIROIS routinely informed other workers at the Shoe Shop that they could survive for about six years without incomes, due to the amount of cash that they had made as a result of the marijuana business.

29.     In about late 2019, WITNESS-1 attended a meeting at the Shoe Shop with CC-2, RANDAL COUSINEAU, and ALISA SIROIS. CC-2 requested the meeting in order to inform COUSINEAU that LUCAS SIROIS was starting a new company, Narrow Gauge Distributors, with CC-3 and CC-4, and that he was doing so in order to circumvent SIROIS's original business arrangement with COUSINEAU, whereby COUSINEAU maintained a partnership interest in any future SIROIS marijuana ventures. WITNESS-1 believed that CC-2 informed COUSINEAU of SIROIS's intent to violate their business arrangement, because CC-2 was close friends with COUSINEAU. ALISA SIROIS was present at the meeting in order to corroborate CC-2's account of LUCAS SIROIS's recent activities. Following the meeting, COUSINEAU began frequenting the Shoe Shop on a regular basis, in order to monitor and safeguard his investment interest in its operations. Eventually, after additional meetings on this topic that WITNESS-1 was aware of, but did not attend, WITNESS-1 learned from CC-2 that SIROIS and COUSINEAU had reached a resolution: COUSINEAU would take a 25% interest in Narrow Gauge Distributors, leaving SIROIS, CC-3 and CC-4 with 25% each.

30.     On March 6, 2020, the investigative team obtained judicial authorization to intercept voice and electronic communications occurring over the CC-1's cellular telephone. The investigative team monitored criminal communications with the CC-1 cellular telephone for a period of 30 days, beginning on March 9, 2020 and learned that CC-1 was an active drug dealer

during this time period, arranging dozens of bulk marijuana transactions, including with individuals who traveled from out of state in order to consummate those transactions. Intercepts also showed that CC-1 worked for and transacted business with LUCAS SIROIS during this time period, including selling bulk quantities of marijuana distillate to SIROIS, and assisting in cultivating marijuana plants. Among other tasks, SIROIS paid CC-1 to perform tissue culturing[1] on his plants during this time period.

31.     On March 14, 2020, at about 1:18 p.m., agents intercepted an incoming call to CC-1 during which the caller and CC-1 discussed the manufacturing of marijuana shatter or marijuana distillate[2] from marijuana supplied by LUCAS SIROIS and that SIROIS was excited about the quality of the distillate that CC-1 was able to manufacture. (Session 700). During the call, the caller and CC-1 discussed ways to circumvent Maine's medical marijuana regulations, including by producing shatter or distillate "off the books," (i.e., without fulfilling applicable reporting requirements), and by improperly repurposing certification numbers to fraudulently represent that their products were certified for sale through the medical marijuana program when they were not.

32.     On March 16, 2020, at about 1:45 p.m., agents intercepted a call between CC-1 and LUCAS SIROIS during which they discussed tissue culturing, the progress of creating

---

[1]     Tissue culture refers to a collection of techniques designed to maintain or grow plant cells, tissues, or organs under sterile conditions in culture media. Tissue culture is a process widely used to produce plant clones and preserve plant genetics lately being adapted by marijuana growers to preserve the genetics of particular desirable strains of marijuana.

[2]     Marijuana distillate is a runny translucent oil devoid of waxes and other undesirable compounds from the original plant. Distillate is highly potent and versatile. It can be used to create marijuana "shatter" or "dabs," and can also be used to create edible and/or topical marijuana products.

distillate from marijuana plants supplied by SIROIS, and the intention of CC-1 to bring distillate to the Shoe Shop the following day. (Session 1057).

33.     On March 20, 2020, at about 11:07 a.m., agents intercepted a call between CC-1 and LUCAS SIROIS during which they discussed CC-1's arrival at the Shoe Shop with a large quantity of distillate and equipment for tissue culturing. (Session 1525). SIROIS also asked whether CC-1 knew anyone that had marijuana because he had commitments to sell marijuana beyond the capacity of the Shoe Shop to provide, and that he was seeking to purchase marijuana from other wholesalers in order to fulfill those commitments.

34.     On about March 15, 2020, New Hampshire State Police seized about four pounds of marijuana sold by CC-1 to two individuals from New Jersey after agents learned about the transaction from intercepted communications. The investigation revealed that one of the buyers frequently purchased marijuana from CC-1 that the buyer distributed in New Jersey. (Sessions 637-642, 644-45, 657-58, 713, 760, 910, 913-21, 927).

35.     On about March 31, 2020, at approximately 2:06 p.m., agents intercepted a call between CC-1 and CC-4 setting up a meeting between CC-1, CC-3 and CC-4, to discuss the cultivation, sale, and processing of bulk marijuana. (Session 5945). The meeting occurred at the Shoe Shop on April 1, 2020

36.     On about April 1, 2020, at approximately 1:32 p.m., agents intercepted a call between CC-1 and CC-3 during which CC-3 told CC-1 that he was late to the planned meeting with CC-3, CC-4 and LUCAS SIROIS at the Shoe Shop. (Session 6424).

37.     On June 25, 2020, the investigative team obtained judicial authorization to intercept voice and electronic communications occurring over LUCAS SIROIS's cellular telephone. On June 26, 2020, the investigative team began monitoring criminal communications

made over the SIROIS cellular telephone; which monitoring was authorized through July 26, 2020. Among other things, the intercepted communications reflected that LUCAS SIROIS: (a) continued to actively engage in the illegal distribution and cultivation of bulk marijuana at numerous facilities, including the Shoe Shop and the Old Toy Factory; and (b) discussed: (1) how to deceive state investigators, (2) the declining price of marijuana, (3) efforts to investigate a law enforcement investigation of him and (4) efforts to further expand his marijuana growing operations in Maine.

38.    On about July 1, 2020, at approximately 10:14 am, agents intercepted a telephone call from LUCAS SIROIS to WILLIAM BREY during which they discussed the operation of the marijuana grow located at the Old Toy Factory; the acquisition of grow equipment for use in the Old Toy Factory through SIROIS's business, the Homegrown Connection; Spruce Valley LLC, the LLC of which they were both members and that owns 105 Avon Valley Road (i.e., the "Old Toy Factory"); and that BREY's costs associated with the build out and operation of the Old Toy Factory were about $180,000, which costs should be considered when calculating the split of the proceeds of marijuana sales between BREY and SIROIS, and that he and SIROIS could each take their share of the drug proceeds on a regular basis. (Session 395).  Later in the conversation, SIROIS and BREY discussed how to fraudulently communicate to an anticipated future state inspector that the Old Toy Factory was in compliance with Maine's medical marijuana regulations, while acknowledging that it actually was not in compliance.

39.    On about July 3, 2020, at approximately 2:26 pm, agents intercepted a telephone call from LUCAS SIROIS to ROBERT SIROIS during which they discussed: (a) the cultivation of marijuana, including additional grows that LUCAS SIROIS was attempting to start; (b) how LUCAS SIROIS'S marijuana cultivation business had slowed in 2020 and how he

made a mistake that cost him an estimated $2.2 to $2.5 million in lost revenue; and (c) that LUCAS SIROIS is aware that WILLIAM BREY sells a portion of the marijuana cultivated at 105 Avon Valley Road (i.e., the "Old Toy Factory") on the black market for distribution in Massachusetts. (Session 816).

40.     On about June 26, 2020, at approximately 9:41 am, agents intercepted part of a call between LUCUS SIROIS and RANDAL COUSINEAU detailing how SIROIS and COUSINEAU are partners and split profits on SIROIS's marijuana business. (Session 1). During the call, SIROIS detailed the economics on marijuana sales, asserting that he and COUSINEAU generate between $1900 and $1950 per pound of marijuana cultivated, and that the proceeds are funneled into Lakemont LLC or Narrow Gauge Distributors LLC.

41.     On about July 1, 2020 at approximately 8:22 am, agents intercepted a call from RANDAL COUSINEAU to LUCAS SIROIS during which they discussed the purchase of property in Carrabassett Valley for $175,000 to turn into a marijuana storefront distributor and how COUSINEAU would finance the purchase. (Session 376). The investigation revealed that, historically, COUSINEAU had provided SIROIS with the capital to build out and expand his capacity to cultivate marijuana, while SIROIS orchestrated the day-to-day operation of that cultivation. As return on his investment, COUSINEAU initially realized half of the proceeds of the marijuana distributed by SIROIS.

42.     On about July 2, 2020 at approximately 1:52 pm, agents intercepted a call from CC-3 to SIROIS during which they discussed: (a) CC-3's and CC-4's efforts to leverage their network of law enforcement contacts to determine the identity of the law enforcement organization that was investigating them; (b) that it was likely to be DEA that was investigating them; (c) that DEA might learn that people from out of state were trying to reach them on

13

Instagram in order to purchase marijuana; (d) that the Carrabassett Valley property would be branded as a Narrow Gauge Distributors store; (e) that RANDAL COUSINEAU would get 25% of the proceeds of that store; and (f) that that they would all make money if they were not in jail. (Session 599).

43.     As part of this investigation, an examination was conducted of records relating to financial accounts held by LUCAS SIROIS and others.  According to Franklin Savings Bank ("FSB") records, In August 2005, SIROIS obtained a $41,000 home equity line of credit ("HELOC") secured by 497 Federal Row, Industry, Maine, real property that was owned by LUCAS SIROIS.  From about January 2016 through about February 2020, FSB records reflect that more than $550,000 in cash was deposited into the HELOC account.  During that same period, records reflect about $520,000 in disbursements from the HELOC account were paid to, among others, Narrow Gauge Consulting; LUCAS SIROIS; Gimbel Properties, relating to real property at 3155 Main Street, in Rangeley; and Howard Buckley, relating to real property at Map/Lot R2-28-005B, North Shore Drive, in Industry.  According to Franklin County records, LUCAS SIROIS and ALISA SIROIS are the owners of 3155 Main Street and Map/Lot R2-28-005B, North Shore Drive.

44.     The FSB HELOC account was used by SIROIS to launder illegal marijuana proceeds.  Cash generated from SIROIS's illegal marijuana business funded the HELOC account and that account was used to make payments, to SIROIS, to companies that he controls, and for real estate that he owns.

45.     On July 21, 2020, in connection with the investigation, federal search and seizure warrants issued by U.S. Magistrate Judge John H. Rich III were executed. Agents seized, among other things, about 4,609 marijuana plants, over 500 kilograms of

processed marijuana, about $1 million from bank accounts, over $250,000 in cash, and 30 firearms. Evidence of a marijuana concentrate laboratory was found at the defendant *in rem* property located at 249 Seamon Road, Farmington, that facilitated a butane THC extraction process to manufacture marijuana concentrate and would not have been operated in compliance with Maine's medical marijuana law.

### 374 High Street Farmington, ME, Sandy River Properties, LLC (the "Shoe Shop")

46.   Real property located at 374 High Street, Farmington, Maine (the "Shoe Shop"), Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution. Property records indicate that 374 High Street is owned by Sandy River Properties, LLC, an LLC whose members are LUCAS SIROIS and RANDAL COUSINEAU.

47.   On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 374 High Street and agents seized, among other things, about 1,805 marijuana plants and about 469.5 kilograms of processed marijuana.

### 407 Wilton Road, Farmington, ME, Robert J. Sirois (the "Homegrown Connection")

48.   Real property located at 407 Wilton Road, Farmington, Maine (the "Homegrown Connection"), was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution. Property records reveal that 407 Wilton Road is owned by ROBERT SIROIS.

49.   The Homegrown Connection is a business that supplies marijuana cultivation supplies and equipment to SIROIS and his coconspirators for their illicit marijuana production and distribution activities.

15

50.     According to records maintained by the Maine Secretary of State relating to the Homegrown Connection LLC, LUCAS SIROIS is the registered agent and "member, manager, or authorized person" associated with the business.  Bank records reflect that LUCAS and ALISA SIROIS are members of the LLC.

51.     LUCAS SIROIS and his coconspirators had constructive possession of the entire building at 407 Wilton Road.

52.     According to WITNESS-1, in 2020, LUCAS SIROIS owned and operated an illegal marijuana grow on the ground level of an attached garage at the Homegrown Connection.   A coconspirator ("CC-5") operated the marijuana grow at the Homegrown Connection at LUCAS SIROIS's direction.   From about October 2017 to the present, a coconspirator ("CC-7") served as the manager of the Homegrown Connection at LUCAS SIROIS's direction.  ALISA SIROIS maintained an office in the Homegrown Connection building and was present at that office once or twice a week.

53.     The Homegrown Connection maintained a bank account ending in 9906 at Skowhegan Savings Bank.  Between July 2014 and February 2020, deposits into the account were as follows:

| Year | Total Cash | Other Deposits | Total Deposits |
|---|---|---|---|
| 2014 (July-Dec) | $   184,424.50 | $58,974.37 | $243,398.87 |
| 2015 | $   460,792.46 | $173,859.51 | $634,651.97 |
| 2016 | $1,033,150.00 | $226,303.56 | $1,259,453.56 |
| 2017 | $1,299,205.00 | $432,269.07 | $1,731,474.07 |
| 2018 | $1,149,975.00 | $227,522.73 | $1,377,497.70 |
| 2019 | $1,013,940.00 | $751,588.85 | $1,765,528.80 |
| 2020   (Jan & Feb) | $236,360.00 | $107,378.17 | $343,738.17 |
| Total | $5,377,846.96 | $1,977,896.26 | $7,355,743.14 |

54.     Included in the checks that were deposited into the account were payments from

the following SIROIS related entities and coconspirators:

| Entity | Total Amount | Period |
|---|---|---|
| Lakemont LLC | $529,013.62 | 2017-2020 |
| Narrow Gauge Real Estate LLC | $95,880.50 | 2016-2019 |
| Sandy River Properties LLC | $61,202.00 | 2017 |
| Spruce Valley LLC | $51,354.73 | 2014-2015 |
| Maia New England | $15,295.06 | 2019 |
| Ms. B's Enterprises | $14,081.13 | 2019-2020 |
| William Brey and Mary-Archer Brey | $9,261.14 | 2019 |
| Total | $776,088.19 | |

55.     Major disbursements from this account appear to be for grow supplies, lights,

utilities and payroll. There were disbursements to Maia New England (an entity known to be

controlled by SIROIS) and to ROBERT SIROIS for rent. The following table represents the

most significant disbursements (by total amount paid to that vendor):

| Payee | Total of Payments |
|---|---|
| BWGS-NC | $1,392,898.96 |
| Sunlight Supply | $563,314.23 |
| Hydrotek | $376,746.62 |
| Griffin Greenhouse Supplies | $339,791.19 |
| ME Bureau of Taxation | $288,358.95 |
| Hydrofarm | $286,798.69 |
| Capital One | $224,977.65 |
| Canna | $192,495.80 |
| Maia New England | $186,280.29 |
| Grocentia | $167,235.71 |
| Hawthorne Hydro | $164,155.02 |
| Fluence Bioengin | $137,287.00 |
| Checks not provided | $129,614.15 |
| Applied Plant Science | $128,917.67 |
| Intuit Payroll | $111,460.77 |
| Central Maine Power | $110,259.71 |
| Nanolux | $98,242.80 |
| Best Value Vacs | $98,157.17 |
| MaiaGrow | $79,308.75 |
| IRS | $67,545.77 |
| ROBERT SIROIS | $32,000.00 |
| Jay Bird Manufacturing | $14,233.37 |

| Payee | Total of Payments |
|---|---|
| Missing Debit Memo | $8,000.00 |
| Excel Do It Yourself Air Systems Corp. | $7,150.00 |
| Can USA Group, Inc | $7,082.32 |
| Triq | $6,831.17 |
| Cannabis Council (Retainer for L Sirois) | $3,000.00 |
| Western Maine Development LLC | $2,524.76 |
| Grand Total | $5,224,668.52 |

**247 Front St., Farmington, ME, Front St. Investments**

56.    Real property located at 247 Front Street, Farmington, Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution.  Property records indicate that 247 Front Street is owned by Front St. Investments, a partnership owned by ROBERT SIROIS, CHARLES WILLIAMS, and PETER BEANE.

57.    According to WITNESS-1, a coconspirator ("CC-6") operated the marijuana grow at 247 Front Street at SIROIS's direction.

58.    On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 247 Front Street and agents seized, among other things, about 399 marijuana plants and about 17.5 kilograms of processed marijuana.

**105 Avon Valley Road, Avon, ME, Spruce Valley, LLC (the "Old Toy Factory")**

59.    Real property located at 105 Avon Valley Road, Avon, Maine (the "Old Toy Factory") was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution.  Property records indicate that Spruce

18

Valley, LLC owns the real property located at 105 Avon Valley Road. Spruce Valley, LLC's members are LUCAS SIROIS and WILLIAM BREY.

60.     According to WITNESS-1, LUCAS SIROIS is a beneficial owner of the industrial marijuana grow located at 105 Avon Valley Road. WILLIAM BREY and MARY ARCHER-BREY own the Old Toy Factory and run the marijuana cultivation operations there. The BREYs operate the Old Toy Factory at SIROIS's direction. SIROIS receives about half of the revenue generated by marijuana sales from the Old Toy Factory grow. Profits from the Old Toy Factory grow have enabled SIROIS to expand his operations at the Shoe Shop. SIROIS expected revenue of about $55,000 per week from his interest in the Old Toy Factory grow.

61.     On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 105 Avon Valley Road and agents seized, among other things, about 1,189 marijuana plants.

### 249 Seamon Road, Farmington, ME, Robert J. Sirois

62.     Real property located at 249 Seamon Road, Farmington, Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution. Property records indicate that the property is owned by ROBERT J. SIROIS. Aerial photographs of the property taken in July 2020 reflected an outdoor grow in a fenced in structure.

63.     According to WITNESS-1, ROBERT SIROIS was employed at the Shoe Shop as a maintenance man and oversaw construction of lockers within the facility. ROBERT SIROIS cultivated marijuana on the second floor of his residence at 249 Seamon Road and the residence was equipped with an active intrusion system designed to alert ROBERT SIROIS via

cellular telephone if vehicles are detected in the driveway of the residence.

On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 249 Seamon Road and agents seized, among other things, about 119 marijuana plants and over seven kilograms of processed marijuana.  Agents also found evidence of a marijuana concentrate laboratory at this property which facilitated a butane THC extraction process to manufacture marijuana concentrate.

## 269 Seamon Road, Farmington, ME, Lucas J. Sirois

64.     Real property located at 269 Seamon Road, Farmington, Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution.  Property records indicate that LUCAS SIROIS is the owner of 269 Seamon Road. Aerial photographs of the property taken in July 2020 reflected an outdoor grow.

65.     On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 269 Seamon Road and agents seized about 494 marijuana plants and about 8 kilograms of processed marijuana.

## 497 Federal Row, Industry, ME, Lucas J. Sirois

66.     Real property located at 497 Federal Row, Industry, Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution.   Property records indicate that LUCAS SIROIS is the owner of 497 Federal Row. Aerial photographs of the property taken in July 2020 reflect an outdoor grow.

67.     According to WITNESS-1, between 2018 and September 2019, a coconspirator

("CC-8") operated the marijuana grow at 497 Federal Row.

68.     On December 22, 2011, CC-8 pled guilty in U.S. District Court, in Maine, to felony attempt to possess with intent to distribute oxycodone and felony distribution of marijuana. On May 2, 2012, CC-8 was sentenced to 57 months in prison on each count to be served concurrently.

69.     On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 497 Federal Row and agents seized, among other things, about 217 marijuana plants and eight firearms.

### Map/Lot R2-28-005B, North Shore Drive , Industry, ME, Lucas & Alisa Sirois

70.     Real property located at Map/Lot R2-28-005B, North Shore Drive, Industry, Maine was purchased by LUCAS SIROIS with proceeds of illegal marijuana production and distribution and/or was involved in money laundering transactions.

71.     According to records on file at the Franklin County Registry of Deeds, on September 9, 2014, LUCAS and ALISA SIROIS purchased the property on North Shore Drive, Industry, Maine, from Howard Buckley. Buckley took a mortgage on the property in the amount of $345,000. The mortgage lien was discharged on August 31, 2017.

72.     According to bank records, between 2015 and 2017, SIROIS made payments from the following accounts to Buckley:

| Institution | Account Number (ending in) | Name on Account | Total Payments |
|---|---|---|---|
| University Credit Union ("UCU") | 0913 | Lucas & Alisa Sirois | $120,220.00 |
| Franklin Savings Bank ("FSB-HELOC") | HELOC-7630 | Lucas Sirois | $   3,229.48 |
| Franklin-Somerset FCU ("F-S FCU") | 2218 | Alisa Sirois | $150,180.00 |

| Total | | | $273,629.48 |
|---|---|---|---|

73.     As set forth below, monthly payments on the mortgage were typically $10,000 plus a wire fee and those monthly payments were typically funded by cash deposits into the accounts as set forth in detail below:

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| F-S FCU 2218 | 4/21/2015 | -$10,015.00 | 4/16/2015 | $2,100.00 | cash |
| | | | 4/17/2015 | $4,000.00 | cash |
| | | | 4/20/2015 | $4,000.00 | cash |
| UCU-0913 | 5/22/2015 | -$10,020.00 | 4/24/2015 | $500.00 | cash |
| | | | 5/12/2015 | $3,500.00 | cash |
| | | | 5/19/2015 | $5,000.00 | cash |
| | | | 5/20/2015 | $890.00 | cash |
| | | | 5/21/2015 | $600.00 | cash |
| F-S FCU 2218 | 6/19/2015 | -$10,015.00 | 5/1/2015 | $2,400.00 | cash |
| | | | 5/14/2015 | $2,500.00 | cash |
| | | | 6/12/2015 | $2,000.00 | cash |
| | | | 6/18/2015 | $3,000.00 | cash |
| UCU-0913 | 7/17/2015 | -$10,020.00 | 8/29/2014 | $2,020.00 | cash |
| | | | 4/16/2015 | $2,500.00 | cash |
| | | | 6/11/2015 | $2,000.00 | cash |
| | | | 7/16/2015 | $5,000.00 | cash |
| F-S FCU 2218 | 8/20/2015 | -$10,015.00 | 7/16/2015 | $1,500.00 | cash |
| | | | 8/6/2015 | $2,000.00 | cash |
| | | | 8/13/2015 | $3,500.00 | cash |
| | | | 8/14/2015 | $2,000.00 | cash |
| | | | 8/18/2015 | $2,000.00 | cash |
| UCU-0913 | 9/18/2015 | -$10,000.00 | 8/28/2015 | $1,500.00 | cash |
| | | | 9/3/2015 | $1,500.00 | cash |
| | | | 9/10/2015 | $2,500.00 | cash |
| | | | 9/18/2015 | $4,000.00 | cash |
| | | | 9/18/2015 | $1,517.55 | Transfer from Share |
| F-S FCU 2218 | 10/20/2015 | -$10,015.00 | 9/10/2015 | $2,000.00 | cash |
| | | | 9/17/2015 | $2,000.00 | cash |
| | | | 9/24/2015 | $2,000.00 | cash |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| | | | 10/1/2015 | $2,000.00 | cash |
| | | | 10/8/2015 | $2,000.00 | cash |
| UCU-0913 | 12/4/2015 | -$10,020.00 | 10/29/2015 | $3,000.00 | cash |
| | | | 11/12/2015 | $3,000.00 | cash |
| | | | 11/19/2015 | $1,500.00 | cash |
| | | | 12/3/2015 | $3,000.00 | cash |
| F-S FCU 2218 | 12/17/2015 | -$10,000.00 | 11/12/2015 | $2,000.00 | cash |
| | | | 11/19/2015 | $2,000.00 | cash |
| | | | 12/3/2015 | $2,000.00 | cash |
| | | | 12/17/2015 | $4,000.00 | cash |
| F-S FCU 2218 | 2/18/2016 | -$10,015.00 | 1/14/2016 | $2,000.00 | cash |
| | | | 1/21/2016 | $2,000.00 | cash |
| | | | 1/28/2016 | $2,000.00 | cash |
| | | | 2/4/2016 | $2,000.00 | cash |
| | | | 2/11/2016 | $2,000.00 | cash |
| UCU-0913 | 3/18/2016 | -$10,020.00 | 2/11/2016 | $3,000.00 | cash |
| | | | 2/19/2016 | $1,500.00 | cash |
| | | | 2/26/2016 | $1,500.00 | cash |
| | | | 3/3/2016 | $1,500.00 | cash |
| | | | 3/11/2016 | $1,500.00 | cash |
| | | | 3/17/2016 | $1,500.00 | cash |
| F-S FCU 2218 | 4/21/2016 | -$10,015.00 | 4/7/2018 | $42,440.00 | cash |
| F-S FCU 2218 | 6/16/2016 | -$10,000.00 | 5/19/2016 | $2,000.00 | cash |
| | | | 5/31/2016 | $2,000.00 | cash |
| | | | 6/2/2016 | $2,000.00 | cash |
| | | | 6/9/2016 | $2,000.00 | cash |
| | | | 6/16/2016 | $2,000.00 | cash |
| F-S FCU 2218 | 7/20/2016 | -$10,015.00 | 6/23/2016 | $2,000.00 | cash |
| | | | 6/30/2016 | $2,000.00 | cash |
| | | | 7/7/2016 | $2,000.00 | cash |
| | | | 7/12/2016 | $2,000.00 | cash |
| | | | 7/20/2016 | $2,100.00 | cash |
| UCU-0913 | 8/19/2016 | -$10,020.00 | 7/7/2016 | $1,500.00 | cash |
| | | | 7/12/2016 | $1,500.00 | cash |
| | | | 7/21/2016 | $1,500.00 | cash |
| | | | 7/28/2016 | $1,500.00 | cash |
| | | | 8/3/2016 | $1,500.00 | cash |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| | | | 8/11/2016 | $1,500.00 | cash |
| | | | 8/19/2016 | $1,500.00 | cash |
| F-S FCU 2218 | 9/15/2016 | -$10,015.00 | 8/12/2016 | $2,000.00 | cash |
| | | | 8/18/2016 | $2,000.00 | cash |
| | | | 8/25/2016 | $2,000.00 | cash |
| | | | 9/8/2016 | $2,000.00 | cash |
| | | | 9/15/2016 | $2,000.00 | cash |
| UCU-0913 | 10/14/2016 | -$10,020.00 | 9/8/2016 | $2,500.00 | cash |
| | | | 9/15/2016 | $1,500.00 | cash |
| | | | 9/22/2016 | $1,500.00 | cash |
| | | | 10/6/2016 | $4,050.00 | cash |
| | | | 10/13/2016 | $1,500.00 | cash |
| F-S FCU 2218 | 11/17/2016 | -$10,000.00 | 10/13/2016 | $2,000.00 | cash |
| | | | 10/19/2016 | $2,000.00 | cash |
| | | | 11/3/2016 | $2,000.00 | cash |
| | | | 11/10/2016 | $2,000.00 | cash |
| | | | 11/16/2016 | $2,000.00 | cash |
| UCU-0913 | 12/20/2016 | -$10,020.00 | 11/25/2016 | $1,500.00 | cash |
| | | | 12/1/2016 | $1,500.00 | cash |
| | | | 12/8/2016 | $1,500.00 | cash |
| | | | 12/15/2016 | $2,500.00 | cash |
| | | | 12/20/2016 | $3,000.00 | cash |
| F-S FCU 2218 | 1/19/2017 | -$10,015.00 | 12/15/2016 | $2,000.00 | cash |
| | | | 12/22/2016 | $2,000.00 | cash |
| | | | 12/29/2016 | $2,000.00 | cash |
| | | | 1/5/2017 | $2,000.00 | cash |
| | | | 1/19/2017 | $2,200.00 | cash |
| UCU-0913 | 2/17/2017 | -$10,020.00 | 12/29/2016 | $1,500.00 | cash |
| | | | 1/5/2017 | $1,500.00 | cash |
| | | | 1/12/2017 | $1,500.00 | cash |
| | | | 1/24/2017 | $1,500.00 | cash |
| | | | 1/26/2017 | $1,500.00 | cash |
| | | | 2/1/2017 | $1,500.00 | cash |
| | | | 2/16/2017 | $1,500.00 | cash |
| F-S FCU 2218 | 3/21/2017 | -$10,015.00 | 2/9/2017 | $2,000.00 | cash |
| | | | 2/16/2017 | $2,000.00 | cash |
| | | | 2/23/2017 | $2,000.00 | cash |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| | | | 3/9/2017 | $2,000.00 | cash |
| | | | 3/15/2017 | $2,000.00 | cash |
| UCU-0913 | 4/18/2017 | -$10,020.00 | 4/18/2017 | $42,803.00 | cash |
| F-S FCU 2218 | 5/18/2017 | -$10,015.00 | 4/20/2017 | $4,000.00 | cash |
| | | | 5/4/2017 | $2,000.00 | cash |
| | | | 5/11/2017 | $2,000.00 | cash |
| | | | 5/18/2017 | $2,000.00 | cash |
| UCU-0913 | 6/19/2017 | -$10,020.00 | 6/8/2017 | $1,500.00 | cash |
| | | | 6/8/2017 | $8,000.00 | Sandy River Properties |
| | | | 6/15/2017 | $1,500.00 | cash |
| F-S FCU 2218 | 7/13/2017 | -$10,015.00 | 6/15/2017 | $2,000.00 | cash |
| | | | 6/22/2017 | $2,000.00 | cash |
| | | | 6/29/2017 | $2,000.00 | cash |
| | | | 7/6/2017 | $2,000.00 | cash |
| | | | 7/13/2017 | $2,000.00 | cash |
| UCU-0913 | 8/18/2017 | -$10,020.00 | 7/6/2017 | $1,500.00 | cash |
| | | | 7/14/2017 | $1,400.00 | cash |
| | | | 7/27/2017 | $3,000.00 | cash |
| | | | 8/1/2017 | $1,500.00 | cash |
| | | | 8/10/2017 | $1,500.00 | cash |
| | | | 8/17/2017 | $1,500.00 | cash |
| FSB-HELOC | 9/1/2017 | -$3,229.48 | 8/22/2017 | $2,500.00 | cash |
| | | | 8/31/2017 | $2,500.00 | cash |
| Total | | -$273,629.48 | | | |

## 5003 Twin Brook Road, Carrabassett Valley, ME, Lucas Sirois

74.    Real property located at 5003 Twin Brook Road, Carrabassett Valley, Maine was used by LUCAS SIROIS and his coconspirators to illegally, cultivate, process, and/or store marijuana for purposes of illegal distribution and/or was purchased by LUCAS SIROIS with proceeds of illegal marijuana distribution and/or was involved in money laundering transactions.

75.     According to records on file at the Franklin County Registry of Deeds, on December 24, 2019, LUCAS SIROIS purchased 5003 Twin Brook Road.  SIROIS obtained a mortgage from Franklin-Somerset Federal Credit Union in the amount of $321,000 for this purchase.  The cash due from SIROIS at closing was about $107,000.

76.     On December 23, 2019, SIROIS purchased an official check from the Franklin-Somerset Federal Credit Union in the amount of $106,775.60 payable to Paul Mills Escrow account.   The check was funded by a withdrawal from his personal account at Franklin-Somerset Federal Credit Union ending in 2612.

77.     The following is a summary of deposits into the personal account of LUCAS SIROIS at Franklin-Somerset Federal Credit Union ending in 2612 which funded the check to the Paul Mills Escrow Account to purchase 5003 Twin Brook Road and fund other withdrawals:

| Date of Deposit | Amount | Source |
| --- | --- | --- |
| 2/14/2019 | $4,000.00 | Sandy River Properties |
| 2/15/2019 | $4,000.00 | Sandy River Properties |
| 2/21/2019 | $4,000.00 | Sandy River Properties |
| 3/7/2019 | $4,000.00 | Sandy River Properties |
| 3/7/2019 | $10,000.00 | Sandy River Properties |
| 3/14/2019 | $4,000.00 | Sandy River Properties |
| 3/14/2019 | $7,600.00 | Unknown-Missing Document |
| 3/21/2019 | $4,000.00 | Sandy River Properties |
| 3/28/2019 | $67.09 | Unknown-Missing Document |
| 3/28/2019 | $4,000.00 | Sandy River Properties |
| 4/4/2019 | $4,000.00 | Sandy River Properties |
| 4/4/2019 | $10,000.00 | Sandy River Properties |
| 4/11/2019 | $4,000.00 | Sandy River Properties |
| 4/25/2019 | $4,000.00 | Sandy River Properties |
| 4/25/2019 | $4,000.00 | Sandy River Properties |
| 5/3/2019 | $4,000.00 | Sandy River Properties |

| Date of Deposit | Amount | Source |
|---|---|---|
| 5/16/2019 | $1,500.00 | Narrow Gauge Consulting LLC |
| 5/16/2019 | $4,000.00 | Sandy River Properties |
| 5/24/2019 | $6,000.00 | Sandy River Properties |
| 7/3/2019 | $10,000.00 | Sandy River Properties |
| 8/2/2019 | $118.00 | Maine Health |
| 8/2/2019 | $10,000.00 | Sandy River Properties |
| 12/23/2019 | $1,700.00 | Deposit Transfer From Share 00 |
| 12/23/2019 | $75,000.00 | Deposit Transfer From NARROW GAUGE CONSULTING |

78.     The funds in the personal account at Franklin-Somerset Federal Credit Union ending in 2612 at that time were the result of deposits and transfers from Sandy River Properties LLC and Narrow Gauge Consulting that were funded with proceeds of illegal marijuana production and distribution.

79.     According to corporate records in F-S FCU's files, Sandy River Properties LLC, was a business principally owned by LUCAS SIROIS and RANDAL COUSINEAU; ALISA SIROIS is identified as an associated person. F-S FCU records relating to the Sandy River Properties LLC account show that LUCAS SIROIS is a signatory to the account.

80.     Sandy River Properties LLC's F-S FCU account is predominantly funded beginning in 2017 with nearly $4,000,000 in deposits from Lakemont LLC, a company whose incorporation records list LUCAS SIROIS as the beneficial owner.

81.     Lakemont LLC also has an F-S FCU account, and F-S FCU records list LUCAS SIROIS as an authorized signatory. F-S FCU records relating to Lakemont LLC's account show that the account was funded with more than $4,000,000 in cash between 2017 and March 2020. Transfers of funds from Lakemont involve proceeds of illicit marijuana production and distribution.

82.     On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 5003 Twin Brook Road and agents seized, among other things, about 94 grams (gross weight) of marijuana.

**42 Village Woods Dr., Rangeley, ME, Lucas & Alisa Sirois**

83.     Real property located at 42 Village Woods Drive, Rangeley, Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution.   Real property records reflect that 42 Village Woods Drive is owned by LUCAS and ALISA SIROIS.  Aerial photographs of the property taken in July 2020 reflected an outdoor grow in a fenced in structure.

84.     According to WITNESS-1, during the summer of 2019, LUCAS SIROIS operated an outdoor marijuana grow behind his house at 42 Village Woods Drive.  WITNESS-1 recalled that during the summer of 2019, marijuana from that outdoor grow was transported to 247 Front Street, Farmington, Maine, where it was trimmed and dried. WITNESS-1 has stated that WITNESS-1 was told by RANDAL COUSINEAU, in 2019, that COUSINEAU had concerns regarding bulk cash that had been stored inside a box at 42 Village Woods Drive, Rangeley, Maine, and was later moved to CC-2's residence.

85.     Between March 28, 2020, and March 29, 2020, LUCAS SIROIS engaged in a text message conversation with an individual.  During this conversation, SIROIS discussed having a marijuana "grow" at his house, a marijuana grow room in the basement of his house, and that he uses the "home grow" to practice new techniques in growing marijuana and to "test genetics" of different marijuana strains. On April 5, 2020 at 10:42 a.m. text message was sent from LUCAS SIROIS to CC-1 in which LUCAS indicated that intended to plant around 260

marijuana plants in an outdoor grow or grows.

86.     On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 42 Village Woods Drive and agents seized, among other things, about 342 marijuana plants, about 1.8 kilograms of processed marijuana, 22 firearms, almost 500 rounds of ammunition and shotgun shells and a $10,000 check from Narrow Gauge Distributors.

### 3155 Main St., Rangeley, ME, Lucas & Alisa Sirois

87.     Real property located at 3155 Main St., Rangeley, Maine was purchased by LUCAS SIROIS with proceeds of illegal marijuana distribution and/or was involved in money laundering transactions.

88.     According to records on file at the Franklin County Registry of Deeds, on August 24, 2016, LUCAS and ALISA SIROIS purchased 3155 Main St. from Gimbel Properties. Gimbel Properties held a mortgage in the amount of $300,000. The mortgage was discharged on October 2, 2019.

89.     Payments to Gimbel Properties were made from the following accounts:

| Institution | Account Number (ending in) | Name on Account | Total of Payments |
|---|---|---|---|
| Skowhegan Savings Bank | 0535 | Lucas & Alisa Sirois | $ 18,526.26 |
| Skowhegan Savings Bank | 2714 | Lucas Sirois & David Burgess | $ 36,969.56 |
| Franklin-Somerset FCU | 2612 | Lucas Sirois | $ 9,264.13 |
| Franklin-Somerset FCU | 2218 | Alisa Sirois | $ 46,315.65 |
| Franklin Savings Bank | HELOC-7630 | Lucas Sirois | $120,420.69 |
| University Credit Union | 0913 | Lucas & Alisa Sirois | $ 74,105.04 |
| University Credit | 0514 | Lucas Sirois & David | $ 18,526.26 |

| Union | | Burgess | |
|---|---|---|---|
| Total | | | $324,127.59 |

90.     As set forth below, monthly payments were about $9,263 and those payments were typically funded by cash deposits into the accounts and transfers from other affiliated accounts including, but not limited to, Narrow Gauge Consulting:

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| FSB-HELOC | 10/4/2016 | -$9,263.13 | 8/25/2016 | $1,000.00 | cash |
| | | | 9/8/2016 | $5,000.00 | cash |
| | | | 9/15/2016 | $4,000.00 | cash |
| FSB-HELOC | 10/19/2016 | -$9,263.13 | 9/22/2016 | $3,000.00 | cash |
| | | | 9/30/2016 | $2,500.00 | cash |
| | | | 10/6/2016 | $2,500.00 | cash |
| | | | 10/13/2016 | $2,500.00 | cash |
| FSB-HELOC | 11/22/2016 | -$9,263.13 | 11/3/2016 | $5,000.00 | cash |
| | | | 11/10/2017 | $2,500.00 | cash |
| | | | 11/17/2016 | $2,500.00 | cash |
| FSB-HELOC | 12/27/2016 | -$9,263.13 | 12/1/2016 | $2,500.00 | cash |
| | | | 12/8/2016 | $2,500.00 | cash |
| | | | 12/15/2016 | $2,500.00 | cash |
| | | | 12/22/2016 | $2,500.00 | cash |
| FSB-HELOC | 2/1/2017 | -$9,263.13 | 12/29/2016 | $2,500.00 | cash |
| | | | 1/10/2017 | $2,500.00 | cash |
| | | | 1/12/2017 | $2,200.00 | cash |
| | | | 1/20/2017 | $2,500.00 | cash |
| FSB-HELOC | 2/24/2017 | -$9,263.13 | 2/8/2017 | $4,000.00 | cash |
| | | | 2/23/2017 | $5,000.00 | cash |
| FSB-HELOC | 3/29/2017 | -$9,263.13 | 3/2/2017 | $2,500.00 | cash |
| | | | 3/9/2017 | $2,500.00 | cash |
| | | | 3/16/2017 | $2,500.00 | cash |
| | | | 3/23/2017 | $2,500.00 | cash |
| FSB-HELOC | 4/26/2017 | -$9,263.13 | 4/6/2017 | $2,500.00 | cash |
| | | | 4/11/2017 | $2,500.00 | cash |
| | | | 4/19/2017 | $5,000.00 | cash |
| FSB-HELOC | 6/1/2017 | -$9,263.13 | 5/11/2017 | $5,000.00 | cash |
| | | | 5/18/2017 | $5,000.00 | cash |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| FSB-HELOC | 6/26/2017 | -$9,263.13 | 6/1/2017 | $2,500.00 | cash |
| | | | 6/8/2017 | $2,500.00 | cash |
| | | | 6/15/2017 | $2,500.00 | cash |
| | | | 6/22/2017 | $2,500.00 | cash |
| FSB-HELOC | 8/1/2017 | -$9,263.13 | 6/29/2017 | $1,500.00 | cash |
| | | | 7/6/2017 | $2,500.00 | cash |
| | | | 7/13/2017 | $2,740.00 | cash |
| | | | 7/27/2017 | $5,100.00 | cash |
| FSB-HELOC | 8/24/2017 | -$9,263.13 | 8/1/2016 | $2,500.00 | cash |
| | | | 8/10/2017 | $2,500.00 | cash |
| | | | 8/17/2017 | $2,500.00 | cash |
| | | | 8/22/2017 | $2,500.00 | cash |
| UCU-0913 | 11/1/2017 | -$9,263.13 | 10/12/2017 | $8,000.00 | Sandy River Properties |
| | | | 10/12/2017 | $1,500.00 | cash |
| | | | 10/19/2017 | $1,500.00 | cash |
| | | | 10/24/2017 | $1,500.00 | cash |
| F-S FCU-2218 | 11/30/2017 | -$9,263.13 | 11/2/2017 | $2,000.00 | cash |
| | | | 11/9/2017 | $4,000.00 | cash |
| | | | 11/13/2017 | $2,000.00 | cash |
| | | | 11/21/2017 | $2,000.00 | cash |
| UCU-0913 | 1/9/2018 | -$9,263.13 | 11/30/2017 | $1,500.00 | cash |
| | | | 12/7/2017 | $1,500.00 | cash |
| | | | 12/14/2017 | $1,500.00 | cash |
| | | | 12/21/2017 | $1,500.00 | cash |
| | | | 12/28/2017 | $1,500.00 | cash |
| F-S FCU-2218 | 1/25/2018 | -$9,263.13 | 12/21/2018 | $2,000.00 | cash |
| | | | 12/28/2018 | $2,000.00 | cash |
| | | | 1/4/2018 | $2,000.00 | cash |
| | | | 1/11/2018 | $2,000.00 | cash |
| | | | 1/18/2018 | $2,000.00 | cash |
| UCU-0913 | 3/13/2018 | -$9,263.13 | 1/25/2018 | $1,500.00 | cash |
| | | | 2/1/2018 | $2,000.00 | cash |
| | | | 2/8/2018 | $1,500.00 | cash |
| | | | 2/15/2018 | $1,500.00 | cash |
| | | | 2/22/2018 | $1,500.00 | cash |
| | | | 3/1/2018 | $1,500.00 | cash |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| | | | 3/9/2018 | $1,500.00 | cash |
| F-S FCU-2218 | 3/28/2018 | -$9,263.13 | 2/15/2018 | $2,000.00 | cash |
| | | | 2/22/2018 | $1,000.00 | cash |
| | | | 2/27/2018 | $2,000.00 | cash |
| | | | 3/9/2018 | $2,000.00 | cash |
| | | | 3/15/2018 | $2,000.00 | cash |
| | | | 3/22/2018 | $2,000.00 | cash |
| UCU-0913 | 4/25/2018 | -$9,263.13 | 3/15/2018 | $1,480.00 | cash |
| | | | 3/22/2018 | $1,500.00 | cash |
| | | | 3/29/2018 | $1,500.00 | cash |
| | | | 4/5/2018 | $1,500.00 | cash |
| | | | 4/12/2018 | $1,500.00 | cash |
| | | | 4/19/2018 | $3,000.00 | cash |
| FSB-HELOC | 5/30/2018 | -$9,263.13 | 5/3/2018 | $2,500.00 | cash |
| | | | 5/11/2018 | $2,500.00 | cash |
| | | | 5/17/2018 | $2,500.00 | cash |
| | | | 5/22/2017 | $2,500.00 | cash |
| F-S FCU-2218 | 6/15/2018 | -$9,263.13 | 5/17/2018 | $2,000.00 | cash |
| | | | 5/22/2018 | $2,000.00 | cash |
| | | | 5/31/2018 | $2,000.00 | cash |
| | | | 6/8/2018 | $2,000.00 | cash |
| | | | 6/11/2018 | $2,000.00 | cash |
| UCU-0913 | 8/14/2018 | -$9,263.13 | 6/5/2018 | $1,500.00 | cash |
| | | | 6/11/2018 | $1,500.00 | cash |
| | | | 6/12/2018 | $1,500.00 | cash |
| | | | 6/21/2018 | $1,500.00 | cash |
| | | | 6/28/2018 | $1,500.00 | cash |
| | | | 7/3/2018 | $1,500.00 | cash |
| | | | 7/10/2018 | $1,500.00 | cash |
| UCU-0913 | 8/29/2018 | -$9,263.13 | 7/24/2018 | $1,500.00 | cash |
| | | | 7/26/2018 | $1,500.00 | cash |
| | | | 7/31/2018 | $1,500.00 | cash |
| | | | 8/9/2018 | $1,500.00 | cash |
| | | | 8/16/2018 | $1,500.00 | cash |
| | | | 8/23/2018 | $1,500.00 | cash |
| SKOW-0535 | 10/2/2018 | -$9,263.13 | 8/9/2018 | $1,000.00 | cash |
| | | | 8/23/2018 | $2,000.00 | cash |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| | | | 8/30/2018 | $1,000.00 | cash |
| | | | 9/6/2018 | $2,000.00 | cash |
| | | | 9/20/2018 | $2,000.00 | cash |
| | | | 9/28/2018 | $1,500.00 | cash |
| UCU-0913 | 10/25/2018 | -$9,263.13 | 9/6/2018 | $1,500.00 | cash |
| | | | 9/13/2018 | $1,500.00 | cash |
| | | | 9/20/2018 | $1,500.00 | cash |
| | | | 9/28/2018 | $1,520.00 | cash |
| | | | 10/4/2018 | $1,500.00 | cash |
| | | | 10/11/2018 | $1,500.00 | cash |
| | | | 10/18/2018 | $1,500.00 | cash |
| SKOW-0535 | 12/28/2018 | -$9,263.13 | 11/20/2018 | $2,000.00 | cash |
| | | | 12/6/2018 | $2,000.00 | cash |
| | | | 12/7/2018 | $2,000.00 | cash |
| | | | 12/17/2018 | $2,000.00 | cash |
| | | | 12/27/2018 | $2,000.00 | cash |
| UCU-0913 | 1/2/2019 | -$9,263.13 | 11/15/2018 | $1,500.00 | cash |
| | | | 11/20/2018 | $1,500.00 | cash |
| | | | 12/6/2018 | $1,500.00 | cash |
| | | | 12/7/2018 | $1,500.00 | cash |
| | | | 12/14/2018 | $3,000.00 | cash |
| | | | 12/27/2018 | $1,500.00 | cash |
| F-S FCU-2218 | 1/25/2019 | -$9,263.13 | 12/27/2018 | $2,000.00 | cash |
| | | | 1/3/2019 | $2,000.00 | cash |
| | | | 1/10/2019 | $2,000.00 | cash |
| | | | 1/17/2019 | $2,000.00 | cash |
| | | | 1/23/2019 | $2,000.00 | cash |
| UCU-0514 | 3/12/2019 | -$9,263.13 | 2/21/2019 | $11,126.29 | Transfer from UCU-0913 |
| | | | 2/25/2019 | $4,300.00 | cash |
| | | | 2/28/2019 | $1,500.00 | cash |
| | | | 3/7/2019 | $1,500.00 | cash |
| F-S FCU 2612 | 3/22/2019 | -$9,264.13 | 3/22/2019 | $10,000.00 | cash |
| SKOW-2714 | 5/7/2019 | -$9,263.13 | 5/3/2029 | $2,000.00 | Narrow Gauge Consulting |
| | | | 5/3/2019 | $12,000.00 | Transfer from SKOW-0535 |

| PAYMENTS ON MORTGAGE | | | FUNDED BY | | |
|---|---|---|---|---|---|
| Account | Date | Amount | Date of Deposit | Amount | Source |
| SKOW-2714 | 5/30/2019 | -$9,263.13 | 5/16/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 5/16/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 5/23/2019 | $2,000.00 | Narrow Gauge Consulting |
| SKOW-2714 | 6/25/2019 | -$9,263.13 | 5/30/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 6/7/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 6/20/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 6/20/2019 | $2,000.00 | Narrow Gauge Consulting |
| UCU-0514 | 7/17/2019 | -$9,263.13 | 5/30/2019 | $1,500.00 | Narrow Gauge Consulting |
| | | | 6/7/2019 | $1,500.00 | Narrow Gauge Consulting |
| | | | 6/14/2019 | $1,500.00 | Narrow Gauge Consulting |
| | | | 6/20/2019 | $1,500.00 | Narrow Gauge Consulting |
| | | | 6/28/2019 | $1,500.00 | Narrow Gauge Consulting |
| | | | 7/12/2019 | $1,500.00 | Narrow Gauge Consulting |
| | | | 7/12/2019 | $1,500.00 | Narrow Gauge Consulting |
| SKOW-2714 | 9/5/2019 | -$9,180.17 | 7/19/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 8/1/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 8/1/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 8/9/2019 | $2,000.00 | Narrow Gauge Consulting |
| | | | 8/15/2019 | $2,000.00 | Narrow Gauge Consulting |
| Total | | -$324,127.59 | | | |

91.     From 2019 to June 2020, deposits into the Narrow Gauge Consulting account

came from the following sources:

| Source of Deposit | 2019 | 2020 | Grand Total |
|---|---|---|---|
| Lakemont LLC | $242,500.00 | $102,000.00 | $344,500.00 |
| Cash | $141,360.00 | $ 10,000.00 | $151,360.00 |
| CG-Bio Genomics | | $100,000.00 | $100,000.00 |
| Makers Nutrition LLC | | $56,981.25 | $56,981.25 |
| Missing Item | $40,000.00 | | $40,000.00 |
| Narrow Gauge Distributors | | $19,250.00 | $19,250.00 |
| Sandy River Properties | | $10,000.00 | $10,000.00 |
| Ms B's Enterprises | | $10,000.00 | $10,000.00 |
| Rubil Associates | | $5,000.00 | $5,000.00 |
| Grand Total | $423,860.00 | $313,231.25 | $737,091.25 |

### 115 Knowlton Corner Road, Farmington, ME, Robert Sirois

92.     Real property located at 115 Knowlton Corner Road, Farmington, Maine was used by LUCAS SIROIS and his coconspirators to illegally cultivate, process, and/or store marijuana for purposes of illegal distribution.   Real property records reflect that 115 Knowlton Corner Road is owned by ROBERT SIROIS.

93.     WITNESS-1 and intercepted call reflect that ROBERT SIROIS was involved in the operation of indoor and outdoor marijuana grows in multiple locations. Electricity records from Central Maine Power for the property reflect a high level of electricity usage which is consistent with the operation of an indoor marijuana grow. From December 2019 to May 2020, the average monthly electricity bill for the property was about $593, with the highest monthly bill of $926 occurring in May 2020.

94.     On July 11, 2020, a law enforcement officer observed that the front windows of the 115 Knowlton Corner Road appeared to be boarded up or obstructed with material from the interior of the house. The officer also observed that the residence has a mini split style heat pump unit on the right side of the house window fans in two of the windows on the far right

side of the house.  Indoor marijuana growers often attempt to control the climate inside indoor grow operations in an effort to maintain ideal growing conditions for the marijuana crops, and that ventilation, air conditioning, and heat pumps units are often used for these purposes.

95.     On July 21, 2020, in connection with the investigation, a federal search and seizure warrant issued by U.S. Magistrate Judge Rich was executed at 115 Knowlton Corner Road and agents seized, among other things, about 44 marijuana plants.

## BASIS FOR FORFEITURE

96.     21 U.S.C. § 881(a)(6) provides for the forfeiture of all proceeds traceable to drug trafficking in violation of the Controlled Substances Act, 21 U.S.C. § 801, et seq.

97.     21 U.S.C. § 881(a)(7) provides for the forfeiture of real property that facilitated drug trafficking in violation of the Controlled Substances Act, 21 U.S.C. § 801, et seq.

98.     28 U.S.C. § 2461 allows for the civil forfeiture of forfeitable property.

99.     18 U.S.C. § 981(a)(1)(A) subjects to civil forfeiture any property, real or personal, involved in a money laundering transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property.

100.     18 U.S.C. § 1956 provides, in relevant part, that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity[,] ... with the intent to promote the carrying on of specified unlawful activity; or … knowing that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity[,] ... shall be sentenced to a fine ... or imprisonment

... or both.

101.     18 U.S.C. § 1957 provides, in relevant part, that: "[w]hoever, … knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

102.     18 U.S.C. § 1956(c)(7)(A) defines drug trafficking as a "specified unlawful activity."

## CONCLUSION

103.     The United States does not request authority from the Court to seize the defendants *in rem* at this time. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

a.     post notice of this action and a copy of the Complaint on the defendants in rem;

b.     serve notice of this action on the defendants *in rem* owner, and any other person or entity who may claim an interest in the defendants in rem, along with a copy of this Complaint; and

c.     file a lis pendens in county records of the defendants *in rem's* status as a defendant in this *in rem* action.

WHEREFORE, the plaintiff respectfully asserts that there is probable cause to believe that the defendants *in rem* are forfeitable to the United States under 21 U.S.C. §§ 881(a)(6), 881(a)(7), 18 U.S.C. § 981(a)(1)(A) , and/or 28 U.S.C. § 2461 and requests:

a.     that the Court decree that the forfeiture of the defendants *in rem* to the United States under 21 U.S.C. §§ 881(a)(6), 21 U.S.C. § 881(a)(7) , 18 U.S.C. § 981(a)(1)(A) , and/or 28 U.S.C. § 2461 is confirmed, enforced, and ordered;

    b.  that the Court thereafter order that the United States Marshal, or his

delegate, dispose of the defendants *in rem* as provided by law; and

    c.  that the Court award Plaintiff United States all other relief to which it is

entitled, including the costs of this action.

Dated at Portland, Maine this 22nd day of July, 2020.

          Respectfully submitted,

          HALSEY B. FRANK
          United States Attorney


           /s/ Donald E. Clark
          Donald E. Clark
          Noah Falk
          Assistant U.S. Attorneys

VERIFICATION

Justin M. Huntley, being duly sworn, deposes and says that I am a Task Force Officer with the U.S. Drug Enforcement Administration and as such have responsibility for the within action, that I have read the foregoing complaint and know the contents thereof, and that the same is true to the best of my knowledge, information and belief.

The sources of my information and the grounds of my belief are official records and files of the United States and information obtained by me during an investigation of alleged violations of Title 21, United States Code and Title 18, United States Code.


  /s/ Justin M. Huntley
Justin M. Huntley
Task Force Officer
U.S. Drug Enforcement Administration


STATE OF MAINE
Cumberland, ss.

Subscribed and sworn to before me this 22nd day of July, 2020.


  /s/ Sandra M. Dow
Notary Public
My commission expires: 10/25/2026